## Case No. 14,722.

UNITED STATES v. CARGO OF SUGAR.

[3 Sawy. 46.] [1]

District Court, D. California. 1874.

FORFEITURE—ENTRY OF GOODS—FRAUDULENT APPLIANCE—COLORED SUGARS—GOOD FAITH.

1. The term "entry." as used in section 1 of the act of March 3, 1863 [12 Stat. 738], must be understood to include the series of acts done by the importer at the custom-house necessary to the introduction of his merchandise into the United States, in compliance with the forms of law.

2. If in the performance of these acts, and as a means of making the entry, the importer is guilty of any false or fraudulent practice or appliance, or uses any false or fraudulent document, he comes within the law.

3. Whether the agent who makes the entry had knowledge of the fraud is immaterial. The guilty knowledge of the owner is sufficient.

4. Where charcoal had been mixed with sugar above No. 12. Dutch standard in color, for the purpose of reducing its grade, and making it appear to be below No. 12 Dutch standard in color, and the importer failed to disclose that fact to the customhouse authorities, held, that the color of the sugar was not thereby altered. It was merely disguised, and the concealment and suppression of that fact by the importer at the time of taking his oath and making his entry, and the oath taken by him, constituted "a false and fraudulent practice and appliance" within the meaning of the law: and this notwithstanding that the law does not require that the color of the sugar be stated in the invoice or entry.

5. Whether the collector was deceived by the attempted fraud, is immaterial.

6. The belief on the part of the importer that he might lawfully put charcoal into his sugar, and thus alter its grade, and enable himself to lawfully enter it as of a lower grade, and that he might lawfully withhold from the custom-house authorities knowledge of the facts, will be no protection to him.

[Suit by the United States against a cargo of sugar. For prior proceedings, relating to the appraisal of the goods for release to the claimant upon bond for value, see Case No. 14,721.]

[1] [Reported by L. S. B. Sawyer. Esq., and here reprinted by permission.]

Delos Lake, U. S. Atty. (Milton Andros, of counsel), for the United States.
Doyle & Barber, for claimants.

HOFFMAN, District Judge (charging jury). The counsel for the claimants has presented. to me instructions, thirty-six in number, with the request that I would give them to you as the law of this case. I have not, according to the state practice. marked upon the margin of each, "Granted" or "Refused." but they may be all treated as refused, except so far as they are contained in what I am about to say.

I approach, gentlemen, the discharge of my duty in this case with a sense of responsibility, not only because of the importance of the proceeding, but because, in the view I take of it, its determination must depend upon the instructions given to you on the matter of law. I have been unable to discern any matters of fact that are seriously controverted, and upon which you are called upon to pass.

In the first place, I desire to say that whether the law on which this proceeding is based be harsh or just, is no concern of yours, nor is the disposition that is to be made of the proceeds in case of confiscation, or whether the collector or the consul has acted well or ill, or whether the officers have been animated by a rapacious spirit or simply by zeal to detect fraud and to discharge their duties. All these considerations are wholly foreign to the purpose. You are called upon simply to decide whether certain matters of fact to which by law the consequence of forfeiture of the goods is attached, have been established by proof. What, then, is the law? The section under which this prosecution is brought provides: "If any owner, consignee or agent of any goods. wares and merchandise shall knowingly make or attempt to make an entry thereof by means of any false invoice, or false certificate of any consul, vice-consul or commercial agent, or of any invoice which shall not contain a true statement of all the particulars hereinbefore required, or by means of any other false or fraudulent document or paper, or of any other false or fraudulent practice or appliance whatsoever, such goods. wares or merchandise, or their value shall be forfeited."

You will perceive that the offense to which the penalty of forfeiture is annexed is the making or the attempt to make an entry of goods, wares and merchandise "by means" of any false document, or false practice or appliance.

What, then, is an entry? The term entry in the acts of congress is used in two senses. In many of the acts it refers to the bill of entry: the paper or declaration which the merchant or importer in the first instance hands to the entry clerk. In other statutes it is used to denote, not a document, but a transaction: a series of acts which are nec-

essary to the end to be accomplished, viz., the entering of the goods. In the latter sense it is used in this statute. The language is: "If any owner or consignee shall make or attempt to make an entry by means of false documents, false invoice or any other false or fraudulent appliances." It is the fraudulent use of means in the attaining of an object and accomplishing of a result, to wit, the entry of the goods, which the statute here denounces. The acts which accomplish this result, and which, taken together, constitute an entry, must have a beginning and an end. There is a moment when the entry is attempted to be made or begun; there is a moment when it is accomplished. The entry may be said to be commenced, or attempted, when the merchant presents his declaration or bill of entry. When this bill of entry has gone to the requisite clerks' desks, when accompanied by the certificate of the consul, the invoice and the oath, it is delivered to the collector and accepted by him, then the goods may, in a just sense, be said to be admitted to entry and the entry to be accomplished. If in the performance of any of those acts, and as a means of making the entry, any false document, appliance or practice is resorted to, then this statute applies and the goods so entered are forfeited to the United States.

Whether, in the course of the proceedings one document is used, or two or three are used, can make no difference. It is also immaterial whether there are one or two bills of entry indicating the dispositions which the importer desires to make of the goods; as of some to the warehouse and some to be withdrawn for consumption, or whether he takes one oath or two oaths. The entry consists of the series of acts required by law to be done to effect that object, and if in the course of them the importer is guilty of any false or fraudulent practice, or uses any false document whatsoever, he comes within the law.

It is urged in this case, on the part of the government, that in making the entry the merchant, in judgment of law, may be said to present himself to the collector with his documents in one hand, and his goods in the other, and if the character of the goods themselves is fraudulently disguised, if any false appliance with respect to them is used, it may justly be said he has effected his entry "by means" of that appliance. I think, gentlemen, it would perhaps be straining the statute to say that any false practice with reference to the goods themselves would be a "means" of making the entry. He does not make his entry "by means" of that false practice or disguise. But he does make his entry "by means" of any false document he may use or any false oath he may take, if such document or oath be requisite and necessary as a means and condition precedent to the goods being admitted to entry. Therefore, if this invoice, the certificate of the con-

sul, or the oath the importer has taken, be false or fraudulent, then he has made use of a fraudulent means necessary to effect the very object he had in view, to wit, the procuring his goods to be admitted to entry.

It is alleged that the oath of Mr. De Ro was false. It is not pretended that Mr. De Ro knew the facts of the case, or was himself, personally, either morally or legally culpable in any point of view. But the knowledge of his principal is his knowledge for such purposes, and that it must be so is evident. For otherwise, any fraud could be perpetrated with impunity by procuring an innocent broker or agent, through whom parties not innocent could effect the entry of their goods. It is, therefore, not the innocence or guilty knowledge of the agent, but it is the knowledge of the owner himself who has devised the fraud which carries with it the consequence of condemnation.

Treating, therefore, Mr. De Ro's oath as if it were made by the owner, it is claimed by the prosecution that it is false. He swears, gentlemen, that he has not concealed or suppressed any fact whereby the revenue of the United States might be defrauded.

It is argued, with the ingenuity which has characterized counsel throughout the whole case, that the suppression or concealment of any fact which the law does not call upon him to disclose is not wrongful, and that inasmuch as, in this case, it was not requisite that in the entry, or the invoice, the color of the goods should be stated, the suppression or concealment of the true color could not be an offense. It is true, gentlemen, that the color of the sugars is not required to be stated in the invoice, but from the nature of the oath that is required to be taken it appears to me plain that congress intended by imposing so searching an oath that there should be disclosed at the time, and not suppressed or concealed, any fact, whether required to be stated in the entry or invoice or not, which it was important to the interests of the revenue to be known, or whereby the revenue of the United States might be defrauded. Had it been intended that the importer should merely swear that the invoice, bill of lading and entry were true, the oath would have been to that effect and nothing more. But it goes further. The importer swears "that the invoice and bill of lading now presented by me to the collector of —— are the true and only invoice and bill of lading by me received of the goods, etc.; that the entry now delivered by me contains a just and true account of said goods, etc., according to said invoice and bill of lading, and that nothing has been, on my part, nor, to my knowledge, on the part of any other person, concealed or suppressed, whereby the United States may be defrauded of any part of the duty lawfully due on said goods,' etc.

It appears to me, that when that oath was

required by congress it was intended to cover just such a transaction as this, and that though the statements of the invoice might be true, though it might contain all that the law required to be stated therein, yet, if from the nature of the transaction by any fraudulent device or contrivance there was something which, if concealed or suppressed, might tend to defraud the revenue of the United States, it was then to be disclosed, and the suppression of and failure to disclose that fact made the oath to that extent a false oath, thus constituting it a false document and appliance "by means" of which the entry was made.

It has been argued, gentlemen, that it is essential that the collector of the revenue should be deceived. But the effect upon the mind of the collector, of the false or fraudulent appliances, is wholly immaterial; whether or not he believed in the statement, whether he was colluding with the party entering the goods, or knew, in advance, that a fraud was intended or was to be attempted, is wholly immaterial. As well might it be said of one indicted for perjury that the magistrate before whom he had appeared, and before whom he was required to take his oath, did not believe the story or knew he was swearing falsely. Such a defense could not for a moment be admitted, and the case is nearly identical with this. The charge here is, the production or use and employment of a false document or the use of false and fraudulent means to accomplish a certain object. If the party has used those means he is clearly guilty of the offense, whether the collector knew of the commission of the offense at the time it was committed, or only discovered it afterwards. In either event the statute operates, and confiscation follows as a consequence of the employment of the fraudulent means to effect an entry of the goods. Nor does the character of the device, whether flimsy or transparent, or readily or with difficulty to be detected, provided it be fraudulent, affect the question. The degree of skill, ingenuity or cunning with which the fraud is contrived, can make no difference. Nor, gentlemen, is it true, as contended, that the forfeiture in such case is limited to the mere goods in relation to which such fraudulent practice is used. The language of the statute is too explicit to admit of any doubt as to its meaning: "If any owner or consignee of any goods, wares and merchandise shall knowingly make, or attempt to make entry thereof by means of any false invoice or fraudulent practice, such goods, wares and merchandise shall be forfeited."

What are the goods, wares and merchandise thus to be forfeited? Plainly, the goods entered or attempted to be entered at the customhouse. There was but one entry, but one invoice in this case. The acts done, taken together, constitute an entry of the goods; an entry of this whole invoice or importa-

tion of sugar. If, in the attempt to effect that object, fraudulent means have been used, the goods so entered are forfeited. It is therefore the whole invoice that is forfeited, or nothing.

Having disposed of these matters, we approach, gentlemen, to the more serious part of the case and the real merits of this transaction. It will strike you as curious that the government should affirm that a practice has been resorted to here, which is morally and legally fraudulent, and that this practice or contrivance should be admitted to have been used, and should be defended and justified on legal, and I believe, moral grounds. It is not often that counsel of distinguished ability and high character are so totally at variance upon moral as well as legal questions. It becomes our duty, therefore, to consider what is the true view to be taken of this transaction.

You are aware that congress has established color as a standard of duty, or the standard, rather, whereby to determine the duty upon sugar. It has been stated to you, and the fact is not disputed, that the adoption of this mode of assessing the duties was the result of very many experiments and attempts to establish other rules by which to determine the amount of duties to be placed on this species of merchandise.

Mr. Bridge informs us that he thinks this standard is, upon the whole, the best and most satisfactory ever adopted, and such seems to be the fact. What, then, was the motive of congress in adopting the standard of color? It is plain, gentlemen, that except so far as protection is concerned, color could only be rationally adopted as indicative of value—not as invariably indicating it, but as generally doing so, and as affording, upon the whole, the best, most convenient and most appreciable test of the value and the quality of the article. That it is so in this case, has been established by the witnesses: for, though they state that color is not the sole criterion of value, and that there are other considerations of great importance to be borne in mind, yet they all admit that color is a very important circumstance to be regarded in determining the value or quality of sugar. It has been shown that sugar in its pure state is colorless, and it would seem to follow that the degree or depth of the color which a particular article of raw sugar possesses must vary with the amount of impurities it contains; and the amount of impurities contained must have a very important effect on the value of the mass. It is said there can be no such thing as disguise in color; that color addresses itself to the senses, that that which appears to be of a certain hue is of that hue; that there is no difference between a real and an apparent color.

The language of the acts of congress in relation to the tariff is used in a commercial and popular sense. It is addressed to practical men of business, and intended to gov-

ern them in the daily affairs of life. There is some plausibility undoubtedly in the assertion, that there is no distinction between real and apparent color; that when an object is presented to the eye and produces a certain effect upon the optic nerve, the effect so produced constitutes, to all intents and purposes, its color. But let us consider. It is admitted that if the government were to impose a duty according to the color of a horse, you could not whitewash him and so change his color within the meaning of the law; or if congress should impose a high duty upon rosewood logs of a certain color, you could not, by staining their surface, give to the logs a darker or lighter hue in order to evade the duty. To this it has been answered that a horse, or log of rosewood, has a natural color, which may be disguised but cannot be altered. But this admits that there may be an apparent color disguising the true color.

But it is said that sugar has no natural color, but only an artificial color; that its hue is the result of its manufacture; that it depends upon the mode in which the manufacture has been conducted, and upon the ingredients that are put into or removed from the sugar, and therefore it cannot be said to have a natural color like a horse or a log of wood. Let us see. Suppose wines were valued according to their clearness and lightness of color, and suppose there were a drug that would give to the light-colored wine a murky, clouded appearance, without, however, injuring the wine; and that after passing through the custom-house, the wine could be restored to its former clearness by the addition of another ingredient which would precipitate the coloring-matter; could it be said that such a practice would be lawful? Do we not feel that the introduction of the first drug, by which there was imparted to the wine a color different from its real color, would be a fraudulent attempt to disguise and conceal the color of the article? True it is, that it would have to the eye a dark color, but it would not be the color legitimately resulting from the ordinary course of manufacture, to which it has been subjected. I have used this illustration, for the color of wine, like that of sugar, may, in a great degree, depend upon its treatment or mode of manufacture.

What, then, is "color" in regard to sugar, as the term is used in the statute? It appears to me, gentlemen, that it is the hue or degree of lightness which the sugar has attained in the ordinary course of its manufacture, and which indicates the degree of perfection to which the process of clarification has been carried. Undoubtedly while the sugar, or while the cane-juice rather, remains in the manufacturer's hands, he may omit to take out the impurities, or may put in impurities if he so desires, for as yet it has not become sugar. The hue of the sugar—that is, the result of his operations—will be determined by the degree to which he has abstracted the impurities or foreign substances from it, or the amount of such foreign substances as he may have introduced into it. But when it has passed out of his hands and gone into the hands of the importer, or the proposed importer, or the merchant, then the hue it has acquired is the "color" that congress had reference to when it established color as the standard of classification. If, then, by the admixture of some foreign and totally different substance, such as caramel, or, as in this case, charcoal, this color be changed, the color so acquired cannot be considered the color to which congress referred as a standard for assessing the duties. It is contended here that the color has been really altered, not disguised; that the mass is of a color below No. 12 Dutch standard of color; that is, that the sugar really possesses the color which you see in that bottle. Is this strictly true? I observe that the lumps of any considerable size, upon being crushed, reveal the color of the sugar as it was before the admixture, and that, in fact, there was only a slight coating of charcoal upon the surface of the lumps, the sugar itself being entirely unaltered; that is, the sugar in the interior of the lumps. Can it make any difference whether the lumps are small or large? The eye perceives in the larger lumps that the charcoal only covers the surface, and that the mass of the sugar in the interior of the lump is unchanged and is of the original color. If our vision were more perfect we would perceive the same phenomenon in the small microscopic particles. It appears to me, under such circumstances, that the color of the sugar cannot, in any sense, be said to have been changed, but rather that it has been disguised.

One other observation will, I think, expose the true nature of this transaction. I am not aware that the obligations of citizens to the government are less solemn or less imperative than those of one citizen to another. Suppose, gentlemen, that a contract had been made and the money paid down, by which one of you agreed to deliver sugar above No. 12 Dutch standard in color, and suppose that, as has been proved here, it were possible to impart to sugar of a dark hue a lighter appearance by putting into it gypsum or chalk, or some other coloring-matter; your contract in the case supposed would (like the obligation of the importer to pay so much to the government, in case his goods are above No. 12 Dutch standard) be to give to the purchaser sugar above No. 12 Dutch standard in color. In both cases the same mode of classification is referred to. In both cases the same phrase is used to indicate the kind of sugar that is the subject-matter of the obligation. The obligation is, in the one case, to pay the duty specified in the act, if the sugar be of a certain color; in the other, to deliver, for a price already paid, sugar of a certain specified color. Would you conceive yourselves at liberty to take sugars of No. 6 in color, and put into them gypsum or chalk, and tender them to the party with whom you had contracted, as

sugars above No. 12? Would you expect him to listen to you, if you should say, "I contracted to give you sugar above No. 12 Dutch standard in color; but what is the Dutch standard of color? You can only know by looking at it through a glass bottle. You can go to the appraiser's office and compare the sugar I offer with sugar above No. 12 Dutch standard, and if the colors are the same I claim the right to tender it, notwithstanding it is in fact No. 6 sugar, and I have used chalk or gypsum to make it appear of a lighter color." Can any man mistake as to the propriety of such a course? It appears to me that there is no difference between the two cases, and the device by which a seller would give a false appearance of lightness is of the same character, and must have the same legal effect, as the device by which the importer would give to these sugars a false appearance of darkness.

If that view be correct, then, gentlemen, in this case the importer, consignee or agent, has mixed charcoal with these sugars in order to disguise the true color, and make them appear to be below No. 12 Dutch standard of color, when in point of fact they were above No. 12 in color, with intent to pass them at the custom-house as sugars of the lower grade; and if he has suppressed and concealed from the officers of the customs the fact that he has tampered with and sought to disguise the color of his goods, then, in my judgment, he has been guilty of a false appliance and fraudulent practice within the meaning of the statute, and must abide the consequences which the law imposes.

It may appear to some of you, gentlemen, that there has been but an innocent mistake as to the law,—a false construction given to the statute. That for this mistake the confiscation of the goods is too severe a penalty, especially as the consequences of that confiscation fall, in great part, upon innocent parties, and to a considerable extent upon the representatives of a gentleman, now deceased, well known for his public spirit, his great mental activity and varied attainments. But you are not at liberty to be influenced by these considerations. Mr. Gordon's ignorance of, or mistake as to the law, cannot excuse him. He did this act at his peril; and if the act be an offense under the statute, the penalty of the law attaches. I will read to you in this connection, from the same authority which one of the counsel has cited, and then shall conclude my remarks.

In the case which I am about to read, congress had enacted that where refined sugars were exported, a drawback or return of duty might be claimed. The law further provided that if any goods should be entered by means of any false denomination, they should be forfeited, unless it were shown that such false denomination happened by accident or mistake, and not from any intention to defraud the revenue. The party in this case entered the goods as "refined sugars;" and claimed the drawback. They were, on the part of the

government, alleged to be not refined sugars, but what are called "bastard sugars," and were seized as having been entered under a false denomination. The first point to be decided was whether the sugars were or were not refined sugars. The court held they were not. The claimant then urged that he thought they were, and that he had merely made a mistake in the construction of the law. The question thus arose whether this was such a mistake as brought him within the proviso of the statute exempting the goods from confiscation when the false denomination was shown to be the result of mistake or accident.

Now, upon this state of facts, which I hope you will bear in mind, as it closely resembles the state of the facts with which we have to deal, Judge Thompson, one of the most eminent judges that ever sat upon the bench of the supreme court of the United States, says:

"The first inquiry which seems naturally to arise is, What is the nature and character of the mistake which will save the forfeiture? Is it restricted to some matter of fact, or does it include mistake as to the application of the law to the subject thus falsely denominated, the qualities of such sugars being fully known to the person making the entry? I cannot think that, upon any sound construction, the proviso can cover mistakes of the latter description. Such are purely mistakes of law, and it is a principle too well settled to admit of being drawn in question, that ignorance or mistake of law furnishes no excuse in any case, civil or criminal. * * * And if the term 'mistake' does not include error of judgment as to matter of law (as I think it does not), I am unable to discover any ground upon which the false denomination can be said to have happened by mistake or accident; and the only remaining question is, whether this was done with an intention to defraud the revenue, within the sense and meaning of the proviso; and it appears to me that it follows as a matter of course that if the entry was by design, and not by mistake or accident, the legal consequence is that it was done to defraud the revenue. * * * Admitting that he himself honestly believed that his sugars were refined sugars, within the meaning of the law, and that he was entitled to the drawback, still it amounts to no more than a mistake or error of judgment upon the law, and does not protect the sugars from forfeiture."

If that be the law, gentlemen, and I see no reason to doubt it, for the same principle is affirmed in a case decided by the late judge of the Southern district of New York, then the circumstance that the owner of these goods believed that he might lawfully put charcoal into them and lawfully withhold the knowledge of that fact from the custom-house authorities, and that he thereby and within the meaning of the law degraded the sugars and lowered their color, and converted them from sugars above No. 12 to sugars below No. 12 in color, and that he might lawfully enter them as of the lower grade—though he honestly believe all this, such erroneous belief

and mistaken construction of the law afford him no excuse, and the goods are subject to forfeiture.

If, therefore, in conclusion, gentlemen, you believe from the evidence that this sugar, after it reached the purchaser's hands, was mixed with charcoal for the purpose of reducing its grade and making it appear to be below No. 12 Dutch standard in color, when in point of fact before the introduction of such charcoal it was above No. 12 Dutch standard in color, and if you believe that Mr. De Ro, when he took his oath and made the entry, suppressed and concealed that fact, or did not disclose it to the custom-house officer, then that suppression and concealment, and the oath so taken by Mr. De Ro, were, in my judgment, a false appliance and practice within the meaning of the law, of which the consequence is a forfeiture of the goods contained in the invoice.