CITRO CHEMICAL CO. *v.* UNITED STATES (No. 2157).[1]

ENTRY, TIME OF—ABANDONMENT, WHEN TO BE MADE.

Entry of a shipment of citrate of lime was attempted to be made by filing with the collector on July 13, 1920, the invoice and a formal declaration. The declaration stated the merchandise had come into New York July 10, 1920, whereas it really did not arrive until August 9, 1920. Upon its arrival the importer deposited the estimated duties and a bond to redeliver on demand, thereby securing the release of the merchandise. However, he did not avail himself of the delivery permit, but, discovering that the merchandise had been damaged by sea water, filed with the collector a notice of abandonment under paragraph X, Section III, tariff act of 1913. By order dated September 16, 1920, the importer was permitted to correct the date of arrival and to redeclare the merchandise, which was done on September 17, 1920. On September 20, a new notice of abandonment was filed. The question for decision is whether or not the abandonment was "within ten days after entry" as provided by paragraph X, Section III. The filing of the invoice and declaration on July 13 was nothing more than a notice that certain merchandise was expected, and was not the entry. The deposit of the estimated duties with the bond upon the arrival of the merchandise was no more than the giving of security and was not the entry. The correction of the date of arrival and redeclaration on September 17 was the entry, and the notice of abandonment filed September 20 was filed "within ten days after entry" as provided by paragraph X.

United States Court of Customs Appeals, June 6, 1922.

APPEAL from Board of United States General Appraisers, G. A. 8509 (T. D. 39017).

[Reversed.]

*John Giblon Duffy* for appellant.

*William W. Hoppin,* Assistant Attorney General (*Pelham St. George Bissell,* special attorney, of counsel), for the United States.

---

[1] T. D. 39159.

[Oral argument May 23, 1922, by Mr. Duffy and Mr. Hoppin.]

Before SMITH, BARBER, and MARTIN, Associate Judges.

SMITH, Judge, delivered the opinion of the court:

Merchandise consisting of 168 casks of citrate of lime was shipped to New York on the steamship *Wildomino*, which sailed from Messina about June 10, 1920. The invoice and bills of lading for the merchandise were received by the importer in New York some time in July, 1920, and were placed in the hands of the firm's customs broker, who attempted to enter the goods for duty on July 13, 1920, by filing with the collector on that date the invoice and a formal declaration purporting to be that prescribed by article 221 of the Customs Regulations of 1915, in accordance with section 2785, Revised Statutes, and paragraphs F and G, Section III, of the tariff act of 1913. From the declaration it appeared that 168 casks of citrate of lime had arrived on the *Wildomino* on July 10, 1920, and that the merchandise was therefore imported into the United States on that date. The *Wildomino* with her cargo of citrate of lime on board was not within the customs jurisdiction of the United States at any time during the month of July, 1920, and neither vessel nor goods arrived at the port of destination until the 9th of August, 1920.

On the arrival of the *Wildomino*, and before any of the citrate of lime was unladen or examined, the customs broker, in order to obtain immediate delivery of the importation, deposited with the collector of customs, in compliance with Treasury regulations, the sum of $2,228.70, which sum it was estimated would become due as duties on final liquidation after examination of the merchandise. (T. D. 13709.) On the security of that deposit and of a bond to redeliver on demand, the collector ordered the merchandise released to the importer with the exception of packages retained for weighing and examination.

Subsequent to the deposit of the estimated duties and the issuance of the permit releasing the merchandise, it developed that that part of the hold of the vessel in which the cargo was stored had been flooded, and that as a result about 45 per cent of sea water was added to the citrate of lime. Just when the Citro Chemical Co. became aware of the condition of the citrate of lime does not appear. It is certain, however, that the company did not avail itself of the collector's delivery permit and that none of the citrate of lime was ever delivered to the importer. The official report of the appraiser shows that the importation did not come before him until after 10 o'clock on August 27, and that the examination of the goods took place at Carteret, N. J., which examination disclosed that the merchandise was so badly damaged because of saturation with sea water that it was unfit for commercial use as citrate of lime.

·On August 26, 1920, the importer, under Section III, paragraph X, act of October 3, 1913, filed with the collector its notice of abandonment of the merchandise, in which notice it was alleged that the importation had sustained damage to the extent of more than 10 per cent both in quantity and value during the voyage. At the time that notice was filed the citrate of lime was still on board the *Wildomino,* and there it remained until October 8, 1920, or later. The deputy collector of customs, by formal order dated September 16, 1920, permitted the importer to correct the date of arrival of the importation and to redeclare the merchandise. On the following day the importer did redeclare and stated that the cargo had arrived on the steamship *Wildomino* on August 9, 1920, instead of July 10, 1920, as originally declared. On September 20, 1920, a new notice of abandonment was filed with the collector on the same grounds as stated in the original notice.

The question of abandonment was submitted by the collector to the Treasury Department, which held that the notice of abandonment came too late and that the department was therefore without authority to grant relief.

The importation and 335 casks of citrate of lime consigned to other parties and damaged in the same way had an invoice value of $143,945, but both importations were so badly damaged that their sale by the steamship company brought the sum of $2,500 only, or considerably less than half the duties collected, which amounted to $6,675.62.

The claim of abandonment was based on the following provision of paragraph X of Section III.

\*        .\*        .\*        .\*        .\*        ·\*,        \*

PAR. X. Nor shall any allowance be made for damage, but the importers may *within ten days after entry* abandon to the United States all or any portion of goods, wares, or merchandise of every description included in any invoice and be relieved from the payment of duties on the portion so abandoned: *Provided,* That the portion so abandoned shall amount to 10 per centum or more of the total value or quantity of the invoice. The right of abandonment herein provided for may be exercised whether the goods, wares, or merchandise have been damaged or not, or whether or not the same have any commercial value: *Provided further,* That section twenty-eight hundred and ninety-nine of the Revised Statutes, relating to the return of packages unopened for appraisement, shall in no wise prohibit the right of importers to make all needful examinations to determine whether the right to abandon accrues, or whether by reason of total destruction there is a nonimportation in whole or in part. (Italics are ours.)

\*        \*        \*        \*        \*        \*        \*

The Board of General Appraisers held first, "that entry consists of all things necessary to secure the discharge of the imported merchandise and its introduction into the commerce of the country;" second, that the entry filed with the collector on July 13 was prematurely made and was of no value, if it had been ignored and a new one made on arrival of the ship and the payment of duty; third, that the payment of duties on the entry constituted an acceptance of

the entry as a proper entry; fourth, that the notice of abandonment came too late inasmuch as it was filed more than 10 days after payment of duties.

The term entry as used by Congress in some statutes means the paper or declaration which the importer files with the collector.—United States *v.* Frazer (25 Fed. Cas. 1207); United States *v.* Legg (105 Fed. 930, 932). In other statutes it refers to the series of acts which accomplish the entrance of imported merchandise into the commerce of the country, and some of the cases go so far as to hold that such an entry "is not regarded as complete or finished until the entire transaction is ended between the owner and the Government in respect to duties thereon—until the duties are liquidated and paid."—United States *v.* Cargo of Sugar (25 Fed. Cas. 288); United States *v.* Baker et al (24 Fed. Cas. 953, 956, 957). Whether one meaning or the other be adopted the same conclusion results, however, and therefore we find it unnecessary to decide in which of the two senses "entry" is used in paragraph X of Section III.

The fact that the importer has no opportunity of ascertaining the condition of imported merchandise until it is released to him from customs custody, and the further fact that the provision authorizing abandonment permits the importer, *notwithstanding the provision of section 2899 of the Revised Statutes, to make all needful examinations of packages released to him in order to determine whether the right of abandonment exists,* seems to favor the interpretation put upon the word entry by the board in its decision and apparently by the Government in its brief on appeal.

If the board's interpretation be accepted and entry be held to mean the succession of acts which accomplishes the introduction of imported goods into the commerce of the country, we see no escape from the conclusion that both notices of abandonment were in time. The record discloses that as late as October 8, 1920, the citrate of lime was on board the steamship *Wildomino* subject to the orders of the collector of customs and still in customs custody. The importation did not enter into or become a part of the commerce of the United States until after October 8, and from that it follows that notices of abandonment filed in August and September were in the hands of the collector before completion of the entry; that is to say, before the citrate of lime became part of the country's merchandise.

On the other hand, if entry as used in paragraph X refers to the *document* which initiated customs proceedings, then the time for filing notice of abandonment began to run with the date of the entry paper, and if entry of the merchandise was made on August 9, 1920, both notices of abandonment were untimely and no relief can be granted to the importer.

The Board of General Appraisers held, in effect, that the deposit of estimated duties constituted a redeclaration and a reentry of the merchandise as of the date on which the deposit was made and that a notice of abandonment filed more than 10 days after such deposit came too late.

That conclusion seems to rest *not on the definition given by the board in its decision,* but on the assumption that the statutory 10 days after entry means 10 days after declaration of the merchandise to the collector, and on the further assumption that the date of the declaration is the date of deposit of estimated duties.

In our opinion the document filed by the importer with the collector on July 13, 1920, was no entry at all, inasmuch as there was then within customs jurisdiction no merchandise whatever to which such a document could attach.   None of the papers filed with the collector on July 13, 1920, imposed any obligation whatever either on the importer or on the collector, and such papers had no more official importance than a report to the collector that certain merchandise was expected to arrive.

Tariff laws, in the very nature of things, contemplate that there must be an importation before goods can be entered for duty, and the presentation at the customhouse of any document in the form of an entry for goods on the high seas imposes no obligation either on the importer or the collector.—United States *v.* Edwin S. Hartwell Lumber Co. (142 Fed. 432, 436, 437).

In order to obtain possession of the imported merchandise before ascertainment of the duties due and to insure the Government against loss resulting from the release of its possessory lien, the importer was required by the regulations to give a bond and to deposit with the collector the estimated duties as security for the full payment of the duties found to be due on liquidation.   (Arts. 230 and 238, Customs Regulations.)   On final liquidation the estimated duties would become a payment of duties pro tanto, *but at the time the deposit was made* it stood in no other relation to the transaction than the six months' bond or other bond exacted under the regulations for the payment of duties.   The estimated duties and the bond might just as well have been given on July 13, 1920, and neither one nor the other can be considered as a declaration or entry of the merchandise, and much less as a reentry or redeclaration of an entry which was null and of no effect at the time it was filed.

If the deposit of estimated duties constitutes a reentry or redeclaration then the giving of the six months' bond or other bond for the same purpose must likewise be so regarded.   More than that, if the deposit of estimated duties must be accepted as dating and validating the entry, then it would result that had the importer deposited the estimated duties on July 13, 1920, which he might have done, he would

have been barred from abandoning goods arriving at destination nearly a month later and concerning the condition of which he could know nothing. Worse still, the year within which reliquidation may be had by the collector would begin to run before the goods reached the United States or came into customs custody.—Cassel v. United States (146 Fed. 146); United States v. Franklin (25 Fed. 1207); United States v. Seidenberg et al. (17 Fed. 227); United States v. Long (18 Fed. 15). We say nothing of the complications that would arise under such provisions as section 33 of the tariff act of 1897, if it should be finally settled that a deposit of estimated duties dates and validates a null entry, but content ourselves with calling attention to the fact that some difficulties would confront the collector in case entry and deposit antedated the arrival of the goods.—United States v. Legg (105 Fed. 930). Deposits of estimated duties and bonds to secure the payment of duties can not be regarded as dating, validating, amending, accepting, or otherwise affecting the original document of entry without entailing consequences which we are quite convinced Congress did not contemplate. It would be far more logical to say that the arrival of the goods rather than the deposit of estimated duties dates, validates and amends the entry, but as that result would be accomplished without any written record of the new date, or of the arrival of the vessel, or of the amendment made, we are not disposed to believe that it was the legislative intent to permit the customs business to be transacted in that way.

The declaration and entry of merchandise is a very formal act imposing upon the importer most serious responsibilities and a declaration, entry, reentry, or redeclaration ought not to be and can not, we think, be implied against him. An entry which does not speak the truth can not be corrected by implication and one which is void can not be galvanized into life by inferences or deductions which leave the document with all its defects and deficiencies unamended.

In this case the deputy collector of customs knowing that neither the goods nor the ship which carried them was within customs jurisdiction when entry was made in July, 1920, and presumably recognizing that the entry was invalid, very properly permitted the importer to correct the date of arrival of the goods and to redeclare the goods. That correction and redeclaration was made on the 17th of September, 1920, and in our opinion that was the date on which the first valid entry of the merchandise was made. As notice of abandonment was filed with the collector of customs on the 20th of September, 1920, it was filed within 10 days after making a valid entry.

Whether entry refers to the series of acts which releases goods to the importer from customs custody or refers to the document which

initiates customs proceedings on imported goods, notice of abandonment was made within the time prescribed by the statute and the importer should have been relieved of the payment of the duties on the merchandise abandoned.

The decision of the Board of General Appraisers is therefore *reversed.*