<hr />

(C.D. 2153)

EXCEL SHIPPING CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided February 17, 1960)

*John D. Rode* (*Ellsworth F. Qualey* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff*, trial attorney), for the defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges; JOHNSON, J., concurring; RICHARDSON, J., concurring

DONLON, Judge: The question here at issue is whether dried fava beans, imported from the Azores at the port of New York during the period from May 1 to August 31, 1955, are entitled to the benefit of the reduced seasonal duty rate under paragraph 765 of the Tariff Act of 1930, as modified by the President's proclamation effectuating the General Agreement on Tariffs and Trade, T.D. 51802 and T.D. 52167.

There is no controversy as to the classification of these beans. They are beans, not specially provided for, other, dutiable under paragraph 765. The controversy before us has to do only with the plaintiff's

claimed right to the seasonal rate reduction. The language of the pertinent GATT modification of paragraph 765, as to beans, is as follows:

Beans, not specially provided for:
Dried, when *entered for consumption* during the period from May 1 to August 31, inclusive, in any year: .

    Red kidney_____ 2¢ per lb.

    Other_____ 1½¢ per lb.

[Emphasis supplied.]

It is shown either by stipulation or in the official papers (which are of record) that these beans were shipped from Ponta Delgada in the "Monte Brasil" on July 18, 1955, consigned to plaintiff, and that they reached New York on July 28 (or possibly 29), 1955; that the merchandise was entered by plaintiff at once on customs Form 7502, "Warehouse or Rewarehouse Entry"; that the warehouse specified in the entry was "Port Whse. 47 Vestry St., NYC."; that entry was made at the seasonal reduced duty rate of 1½ cents per pound, and estimated duties were tendered and accepted by the collector on that basis on or before August 31, 1955.

Both the entry, Form 7502, and the permit, Form 7502-A, are endorsed with the following statement:

To be transferred to Port Whse (Vestry St.) there to be retained until released by B.E.P.Q. who will notify us when same may be sampled and weighed. Whf view and gross weigh.

There are no proofs as to what this endorsement signifies. However, it appears to be common knowledge in customs circles that this is a stamp affixed to entry papers in the customs line whenever the merchandise is such that the Bureau of Entomology and Plant Quarantine of the United States Department of Agriculture requires it be sent to warehouse for fumigation. The final direction of this stamped endorsement is to the inspector on the wharf, cautioning him not to inspect the beans on the wharf beyond a "view" and taking the gross weight. Again, it is known that this is the procedure followed when rules require the fumigation of imported merchandise before it may enter into the commerce of the country. As directed, fumigation by the Department of Agriculture is to precede sampling and weighing by the Customs Bureau.

These beans are fava beans. The rules of the Department of Agriculture, of which the court may take judicial notice, require (and in 1955 required) that imported fava beans shall be fumigated by the Bureau of Entomology and Plant Quarantine before they may be delivered out of customs custody.

The beans of this importation were withdrawn from the warehouse in two lots, according to the warehouse officer's return on customs

Form 7505–A, on August 15, 1955, and August 31, 1955. Liquidation was on July 17, 1956, when duty was increased to 3 cents per pound, the nonseasonal rate for these beans.

Plaintiff's original protest raised only its claim to the benefit of the seasonally reduced rate. By protest amendment in open court, plaintiff further claims:

The acceptance of this entry by the office of the Collector of Customs, showing a 1½ cents a pound rate of duty, under Paragraph 765, was a clerical error, or other inadvertence on the part of the Collector's office within the meaning of Section 520(c)(1) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1953.

Plaintiff's amended claim is that the collector is empowered, and may be directed by judgment order of the court, to reliquidate the entry of this merchandise to correct his "clerical error" or inadvertence in failing to reject a warehouse entry filed at the reduced seasonal rate.

It is the gist of plaintiff's principal claim that when dried beans which are subject to the seasonal rate reduction are entered by the importer into warehouse at the seasonal rate within the period of rate reduction and are withdrawn for consumption within the same period, the test set up for entitlement to the GATT seasonal rate modification has been met. Defendant denies this, arguing that only such beans as are entered on a consumption entry form may qualify as beans that are "entered for consumption" within the rate reduction period, in the sense intended by the GATT negotiators.

Are the words "entered for consumption," as used in the GATT modification of paragraph 765, synonymous with the words "entered under a consumption entry," as defendant appears to contend? Or do they have a somewhat different significance, as plaintiff argues?

In their briefs, both parties discuss the decision of this court in D. Kelman & Co. v. United States, 28 Cust. Ct. 112, C.D. 1396, a decision which became final without appeal. The record in the Kelman case admirably illustrates the uncertain value of some court decisions as reliable precedents. The sole proofs of record in the Kelman case were the official papers. These have long since been returned to the collector, and they are not available to us now. We are left with absolutely no proofs of record in the Kelman case for comparison with the proofs of record before us here. There is nothing in the opinion to illuminate points of similarity or of difference.

What kind of beans were the Kelman beans? Did they require fumigating? Were they entered in usual course into bonded warehouse for the importer's convenience, or because of Government quarantine requirements? It is idle to speculate. The record before us in the Kelman case is barren of answers. Our decision must be made on the record that is now before us, and on the law that is applicable

to the proofs here. Our problem is to ascertain what the GATT negotiators intended, in relation to these facts, when they used the expression "entered for consumption."

"Entry" is a customs word of particular significance. In *United States* v. *Legg*, 105 Fed. Rep. 930, the Court of Appeals for the Second Circuit construed the word "entry" as it was used in section 33 of the Tariff Act of 1897:

> * * * on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported, for which no *entry* has been made * * *. [Emphasis supplied.]

The court said:

> The only remaining question is whether this written entry by the importer under section 2785 is the "entry" referred to in section 33 of the act of 1897. "The term 'entry,' in the acts of congress, is used in two senses. In many of the acts it refers to the bill of entry,—the paper or declaration which the merchant or importer in the first instance hands to the entry clerk. In other statutes it is used to denote, not a document, but a transaction,—a series of acts which are necessary to the end to be accomplished, viz. the entering of the goods." Hoffman, J., in U.S. v. Cargo of Sugar, 3 Sawy. 46, Fed. Cas. No. 14,722. That case was a prosecution under a statute providing a penalty "if any owner or consignee of goods shall knowingly make or attempt to make an entry thereof by means of any false invoice or false certificate * * * or of any other false or fraudulent practice or appliance whatsoever." Manifestly, the word "entry," in such statute, referred to the entire transaction of passing the goods through the custom house. To the same effect is U.S. v. Baker, 5 Ben. 251, Fed. Cas. No. 14,500. But the word is most frequently used in the statutes (e.g. Rev. St. U.S. §§ 2786–2788, 2790 2794, 2799, 2800, 2802, 2869, 2900), as it is in the practice of the custom house and in common speech, as referring to the particular documents which the statutes in pari materia require and which they designate as "entries." We see no reason, and are referred to no authority, for holding that the word is used in this section (33) with any other meaning than its usual one. Indeed, the form of phrase used, "goods * * * for which no entry has been made," seems to import a reference to the entry which the importer is required to make. [*United States* v. *Legg, supra*, at p. 933.]

In *Mussman & Shafer, Inc.* v. *United States*, 27 Cust. Ct. 180, C.D. 1367, the first division of this court considered the meaning of the expression "entered for consumption" in a situation where it was necessary to determine the date on which imported merchandise was *entered for consumption*. In a carefully reasoned opinion, Judge Mollison stated the problem and the rule as follows:

> * * * Obviously, the decision in this case turns upon the meaning to be ascribed to the term "entered for consumption." The plaintiff contends that that term refers to a transaction which is not complete so that the goods may be said to have been "entered for consumption" until all of the acts and formalities required in connection with the entry of merchandise—including the filing of the entry papers and payment of estimated duties on the part of the importer, and acceptance of the entry and issuance of a delivery permit on the part of the Government—have been performed, *and, in addition, either the merchandise be present and available for delivery to the importer at the port of entry or be*

*actually physically released to the importer.* The defendant contends that the term refers only to the filing of the entry document with the collector.

In our view, both the language of the regulation itself and the decided cases tend to support the contention of the plaintiff. In *United States* v. *Legg*, 105 Fed. 930, at page 933, Judge Lacombe of the Circuit Court of Appeals, Second Circuit, quoted the following from the decision of District Judge Hoffman in *United States* v. *Cargo of Sugar*, 25 Fed. Cas. 288, No. 14,722:

> * * * The term "entry," in the acts of congress, is used in two senses. In many of the acts it refers to the bill of entry,—the paper or declaration which the merchant or importer in the first instance hands to the entry clerk. In other statutes it is used to denote, not a document, but a transaction,—a series of acts which are necessary to the end to be accomplished, viz. the entering of the goods.

In the *Legg* case, the context indicated that the written document required of an importer and not the entire transaction or series of acts necessary to the entering of goods was intended. We are satisfied that the language and context of the regulations here involved indicate that the series of acts necessary to the entering of the goods was intended to be meant by the words "entered for consumption." Those words are coupled with the words "or withdrawn from warehouse for consumption," indicating an intention to determine the duty status of the goods at the time they enter the domestic commerce of the United States.

The decided cases are uniform in holding that in the absence of contrary statutory provision goods are not "entered" or "withdrawn" for the purpose of determining the duties applicable thereto until the transaction is complete by the payment of duties and the issuance of an unconditional delivery permit passing control of the goods to the importer or owner. [Citations omitted.]

Behind these decisions is the general rule that the dutiable status of imported merchandise is to be determined at the time it enters into the commerce of the country. A reading of the proclamation and the regulations prescribed in pursuance thereof is convincing that no departure from the general rule was intended in this case. [Pp. 184, 185; emphasis quoted.]

In the *Mussman* case, the customs inspector was required to measure imported plywood before releasing it and, therefore, all customs functions requiring the temporary detention of the merchandise had not been completed at the controversial date. Hence, the delivery permit *on the facts of that case* was not an instrument which, in a legal sense, passed unconditional control of the plywood from customs custody to the importer or owner.

On appeal, the decision of this court was affirmed. *United States* v. *Mussman & Shafer, Inc.*, 40 C.C.P.A. (Customs) 108, C.A.D. 506.

In *Wilbur-Ellis Company* v. *United States*, 33 Cust. Ct. 173, C.D. 1649, this division of the court distinguished the doctrine of the *Mussman* case, *supra*, from the facts of record in the *Wilbur-Ellis* case. Canned bonito imported from Peru had been physically released from customs custody to the importer on October 5, 1951. Subsequently, on November 1, 1951, the importer was notified by the collector of customs at New Orleans that samples had been withdrawn for analysis under the Federal Food, Drug, and Cosmetic Act; that the merchandise must

be held intact pending results of the analysis; that, if the canned bonito failed to comply with the requirements of the Food Act, the merchandise must be returned to the collector for destruction, exportation, or other prescribed disposition. On the same day, November 1, 1951, the Federal Security Agency notified the importer that examination of the shipment had been completed and the importer need not further detain the goods.

Citing *United States* v. *De Villamil*, 12 Ct. Cust. Appls. 255, this court quoted, in the *Wilbur-Ellis* case, from the decision of our appeals court in the *De Villamil* case, as follows:

The meats imported were not withheld from delivery because of any customs service which remained to be performed, and it can not be said, therefore, that the goods were in customs custody for customs purposes. They were withheld by the collector of customs acting for the Bureau of Animal Industry and were therefore in law and in fact in the custody of the Bureau of Animal Industry. [*Wilbur-Ellis Company* v. *United States, supra*, at p. 176.]

On the facts of the *Wilbur-Ellis* case, the requirement of the Federal Food, Drug, and Cosmetic Act that the imported canned bonito be detained in the importer's possession, pending analysis, was held not to be tantamount to a withholding in customs custody before delivery to the importer, because of any customs service which remained to be performed.

In these cases, there were tariff provisions different from the tariff provision here. However, the court was construing in different situations the language that is before us now, namely, "entered for consumption." The holding was that this does not connote merely the written *entry* papers filed by the importer, but, in the spirit of Judge Lacombe's opinion in the *Legg* case, *supra*, that Congress intended to connote by the phrase "entered for consumption" a series of acts which are necessary to and which culminate in the entering of goods into the commerce of the country. That is the time when goods are entered, and not when a particular document, which in customs parlance is called an "entry," is filed with an entry clerk.

Here, there remained to be performed, after the beans were fumigated by customs direction in quarantine, the customs services of sampling and weighing. The official papers make that clear. Indeed, it is the well-known practice in quarantine cases, and for good reason, that all customs functions save a cursory customs "view" shall follow the lifting of the quarantine.

It is axiomatic that hard cases make bad law. This is not necessarily so where the court in the hard case delimits the decision to the facts of that case.

We hold, following *United States* v. *Legg, supra*, and other cited cases, that the terms "consumption entry" and "entered for con-

sumption" are not synonymous. We further hold *on the facts of record in this case* that these fava beans were entered for consumption within the period between May 1, 1955, and August 31, 1955, and, hence, are entitled to the benefit of the seasonally reduced rate of 1½ cents per pound.

This is by no means to be interpreted as a holding that "entered for consumption" and "withdrawn for consumption" are in all cases to be construed as equivalent terms. It is obvious that they are not. We do not so hold.

It is well known that the warehouse entry is a device intended to advantage the importer. With his imported goods in bonded warehouse, an importer has considerable leeway to arrange the timing of release from customs custody, with related advantage as to the time of paying estimated duties. He has not this advantage when his goods are not entered into warehouse.

It is clear that the importer here neither sought nor took advantage of the benefits of warehouse entry. Plaintiff might have filed a consumption entry, but the procedure would have been no different. These beans would not have been released to importer on a consumption entry, without first passing through a warehouse for fumigation. Delivery was to the very warehouse which was specified by the customs service in its rubberstamp affixed to the entry, and not to a bonded warehouse of the importer's choice. Delivery was in quarantine, as required by the Government, as a step antecedent to customs clearance. Fava beans must pass through quarantine and be fumigated, and this is done under Government supervision.

Attached to the official papers which are before us, there is copy of a letter, under date of October 1, 1956, from F. B. Laughlin, the then assistant collector of customs at the port of New York, addressed to the Commissioner of Customs, Treasury Department, Washington, D.C. The assistant collector's letter has to do with the very transaction which is now before us. The following excerpt from Mr. Laughlin's letter states the situation succinctly:

It is the general practice of importers and brokers to make warehouse entries for food products pending release of the shipment by the Department of Agriculture. Excel Shipping Corporation looked up the rate, etc., in the Customhouse Guide. This does not contain the notice about withdrawals from warehouse being subject to duty at 3¢ per pound, regardless of when withdrawn. If they had been aware of this before they would have made immediate entry for consumption.

The warehouse entry #73393 was filed at the rate of 1½¢ per pound. This error of the importer was not detected by the entry officer and the entry was accepted and passed at the 1½¢ rate, calling for estimated duties of $3,705.90. On August 4th, the importer submitted and the warehouse officer approved withdrawal of 900 bags at 1½¢ per pound, and on August 29th, the importer submitted and the warehouse officer approved withdrawal of 1,328 bags at 1½¢

per pound. Duties were paid on these withdrawals on August 4th and August 29th, respectively.

\*          \*          \*          \*          \*          \*          \*

Apparently, neither the Liquidating Division nor Excel Shipping Corporation considered possible relief under section 520 of the Tariff Act. I believe that an "inadvertence not amounting to an error in the construction of law, adverse to the importer and manifest from the record" occurred in the acceptance of the warehouse entry at 1½¢ per pound, and that this inadvertence was twice repeated when the withdrawals at 1½¢ per pound were permitted.

The entry was liquidated July 17, 1956 for $7,351.35, an increase of $3,645.45. A protest #13404, was filed September 13, 1956. This did not claim clerical error or seek relief under section 520, but the importer has made such claim and sought such relief today. I believe that the importer's letter of November 30, 1955 did bring the error, mistake or inadvertence to our attention prior to liquidation, and recommend that relief be granted.

Reply to Mr. Laughlin's letter was by letter addressed to Collector Dill, under date or November 8, 1956, signed by P. K. McCarthy, acting chief, division of entry, value and penalties, copy of which is also in the official papers. From this letter, we quote the following:

It would appear from the facts involved that the entry of the beans for warehousing rather that [sic] for consumption was the result of an error as to the construction of paragraph 765 of the tariff act, which error of law is not correctible under the provisions of section 520(c)(1) of the tariff act. In any event, the Bureau is of the opinion that the proper procedure in this case is to forward the timely filed protest to the United States Customs Court for adjudication.

The testimony of Mr. Barnet Wendroff, chief clerk of the entry division at the Port of New York, gives support to plaintiff's argument. Over a barrage of objections by counsel for defendant, Mr. Wendroff outlined the duties of an entry clerk. He conceded that if an entry is presented for merchandise for which the rate shown is 1½ cents per pound, and the correct rate of duty is 3 cents per pound, the entry clerk should reject the entry, and it is an error or mistake if he does not do so.

The Government contends strenuously that fava beans on warehouse entry are dutiable at 3 cents per pound. The entry clerk had no authority to make any independent ruling as to duty rate, but was required to perform solely a clerical and nondiscretionary function. It is difficult to see how the error of the entry clerk could have been an error in a matter of law. To carry forward into customs practice the notion that when an entry clerk fails to follow his prescribed clerical duties *with respect to entry procedure*, it is, nevertheless, not a clerical error *on his part* whenever after litigation it is found that the Bureau was in error as to the basic law, would be to stultify in large part the intention of Congress in granting to importers the procedural remedies provided by section 520.

No one could expect the entry clerk to make an independent judgment as to the law. No one here expected him to do so. That was not his function. Any error of law was not his error. On the record before us, it was his duty to reject an entry that did not show the duty rate as the Bureau interpreted it. This was a mere clerical task. In failing to do this, he committed a clerical error or inadvertence.

Plaintiff's two protest claims are alternative. Having found that the fava beans are entitled to the benefit of seasonal rate modification because they were "entered for consumption" within the rate reduction period, it is not necessary that our judgment order be directed also to the manner of correcting the clerical error or inadvertence of the entry clerk. Moreover, plaintiff's protest was timely filed under section 514.

The protest is sustained. Judgment will be entered directing the collector to reliquidate on the basis of a duty rate of 1½ cents per pound and to make refund accordingly.

### CONCURRING OPINION

JOHNSON, Judge: While I concur in the conclusion of my associates in this case, I reach that result on different grounds.

The merchandise in this case consists of dried fava beans classifiable under paragraph 765 of the Tariff Act of 1930, the only question being whether or not they are dutiable at the reduced rate set out in the modification of said paragraph by the General Agreement on Tariffs and Trade, T.D. 51802, which provides:

Beans, not specially provided for:
   Dried, when entered for consumption during the period from
      May 1 to August 31, inclusive, in any year:

   *         *         *         *         *         *         *
      Other_____ 1½¢ per lb.

This merchandise arrived in this country on or about July 28, 1955, and was entered for warehouse on that date. It appears from the official papers that these beans were transferred to port warehouse to be retained until released by the Bureau of Entomology and Plant Quarantine. They were withdrawn from warehouse for consumption prior to August 31, 1955. It further appears that it was the general practice of importers and brokers to make warehouse entries for food products pending release by the Department of Agriculture.

Except for the fact that this merchandise had to be examined and released by the Department of Entomology and Plant Quarantine, the circumstances in this case are on all fours with those in *D. Kelman & Co. v. United States*, 28 Cust. Ct. 112, C.D. 1396. There, dried beans had been entered under a warehouse entry on August 17, 1949, and withdrawn on a duty-paid warehouse-withdrawal-for-consump-

tion entry on August 31, 1949. The appraiser advisorily returned the merchandise as dutiable at the rate of 1⅛ cents per pound, but the collector assessed duty at the rate of 3 cents per pound. Protest was filed, the importer claiming that the provision in the trade agreement was intended to include merchandise entered, or withdrawn from warehouse, for consumption during the stated period. The court overruled the protest on the ground that the words "entered for consumption" in the modification of paragraph 765 by the General Agreement on Tariffs and Trade were intended to limit the reduced rate to beans which had been entered directly for consumption during the stated period, excluding those which were withdrawn from warehouse for consumption during that time.

In my view, the material facts in the instant case are not sufficiently different from those in the *Kelman* case to warrant a distinction. While fumigation of the beans may have been required by the Department of Agriculture, there is nothing in the record to show that entry for warehouse was also required. I adhere to the holding of the *Kelman* case that merchandise entered for warehouse and then withdrawn for consumption is not entitled to the reduced rate of duty provided in the trade agreement.

However, in view of other circumstances set forth in the record, I am of the opinion that this particular importation is properly subject to duty at the reduced rate. The original protest in this case claims only that the merchandise was dutiable at 1½ cents per pound under paragraph 765, as modified. An amended protest was filed thereafter, which was subsequently corrected at the trial to read:

> The acceptance of this entry by the office of the Collector of Customs, showing a 1½ cents a pound rate of duty, under Paragraph 765, was a clerical error, or other inadvertance on the part of the Collector's office within the meaning of Section 520(c)(1) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1953.

The record in this case establishes that this merchandise was entered under a warehouse entry at the reduced rate of 1½ cents per pound under paragraph 765, as modified. This entry was accepted by the entry clerk and estimated duties on that basis were paid. Under our decision in the *Kelman* case, *supra*, a warehouse entry should have carried the full rate of duty of 3 cents per pound.

At the trial, Barnet Wendroff, chief clerk of the entry division at the port of New York, testified that it was the duty of the entry clerk to check the rate and amount of duties on entries which are presented to him to see that they are correct and, if the proper rates are not shown, he should reject the entry. If it is not rejected, it is an error on his part.

According to papers in the official file, which were received in evidence, had warehouse entry not been allowed at the rate of 1½ cents

per pound, other arrangements for entry would have been made, since it was the intention of the importer to withdraw the merchandise for consumption prior to August 31, 1955. Therefore, had the entry been rejected instead of accepted, due to an error on the part of the entry clerk, the importer would have filed a consumption entry. It was stipulated at the trial that if the merchandise had been entered under a consumption entry at the same time that the warehouse entry was made, it would have been dutiable at 1½ cents per pound.

Section 520 (c) (1) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1953, provides:

> (c) Notwithstanding a valid protest was not filed, the Secretary of the Treasury may authorize a collector to reliquidate an entry to correct—
>> (1) a clerical error, mistake of fact, or other inadvertence not amounting to an error in the construction of a law, adverse to the importer and manifest from the record or established by documentary evidence, in any entry, liquidation, appraisement, or other customs transaction, when the error, mistake, or inadvertence is brought to the attention of the customs service within one year after the date of entry, appraisement, or transaction, or within sixty days after liquidation or exaction when the liquidation or exaction is made more than ten months after the date of the entry, appraisement, or transaction; * * *.

In the instant case, it appears from the record that the error was called to the attention of customs officials on November 30, 1955, which was within 1 year of entry and prior to liquidation. Therefore, the collector's decision refusing to correct the error merged in the liquidation. *United States* v. *B. Holman, Inc.*, 29 C.C.P.A. (Customs) 3, 14, C.A.D. 164. Consequently, the protest might properly be amended, as was done in this case, to include a claim that the acceptance of the entry was a clerical error or other inadvertence, since such claim could have been made in the original protest. *United States* v. *Macksoud Importing Co. et al.*, 25 C.C.P.A. (Customs) 44, T.D. 49041.

In *Import Export Service of N. J. et al.* v. *United States*, 38 Cust. Ct. 235, C.D. 1869, this court stated (p. 238):

> Under sections 514 and 515 of the Tariff Act of 1930, the court clearly has jurisdiction where the collector has refused to reliquidate on the ground of clerical error. It also has authority to review any and every decision of the collector as to the rate and amount of duties chargeable, and his liquidation or reliquidation of any entry. *United States* v. *Swedish Produce Co.*, 4 Ct. Cust. Appls. 223, T.D. 33437; *United States* v. *Mandel Bros.*, 7 Ct. Cust. Appls. 476, T.D. 37051. Where a valid protest is filed against a liquidation, the court may order a reliquidation for the correction of any errors, legal or factual, made by the collector in the liquidation. * * * The court may direct a reliquidation where through clerical error an incorrect duress certificate was filed (*S. Yamada* v. *United States*, 26 C.C.P.A. (Customs) 89, T.D. 49628) or where the collector has refused to liquidate for other clerical errors discovered within the statutory time limit. *H. H. Elder & Co.* v. *United States*, 20 Cust. Ct. 61, C.D. 1084; *Esso Standard Oil Company* v. *United States*, 30 Cust. Ct. 111, C.D. 1506; *Samuel Shapiro & Company, Inc.* v. *United States*, 31 Cust. Ct. 189, C.D. 1568.

I am in accord with the holding of my colleagues that the action of the entry clerk in accepting the warehouse entry with the reduced rate of duty was a clerical error or inadvertence. It is my view, therefore, that this matter should be treated as if that were done which ought to have been done, namely, the rejecting of the warehouse entry and the filing of a consumption entry. For this reason only, I concur in the judgment directing the collector to reliquidate the entry, assessing duty at the rate of 1½ cents per pound under paragraph 765 of the Tariff Act of 1930, as modified. I would again emphasize, however, that I reach this conclusion on the special circumstances of this case, but, as a general proposition, I adhere to the holding in the *Kelman* case that merchandise entered for warehouse, rather than directly for consumption, is not entitled to the reduced rate of duty provided in the trade agreement.

### CONCURRING OPINION

RICHARDSON, Judge: In view of the history of using the expressions "entered," "entered for consumption," "entered for consumption or withdrawn from warehouse" interchangeably in connection with quota and seasonal rate provisions and the fact that the purpose of the General Agreement on Tariffs and Trade was to make the 1½-cent rate available when imported dried beans entered the channels of domestic commerce during the stated seasonal period, and these imported dried beans were entered, and were withdrawn from warehouse for consumption and did enter the channels of domestic commerce during the stated seasonal period, I am of the opinion that plaintiff is entitled to the 1½-cent rate at which it entered the dried beans. I am also of the opinion that plaintiff is entitled to relief for clerical error within the meaning of 19 U.S.C.A., section 1520(c)(1) (sec. 520(c)(1) of the Tariff Act of 1930, as amended). I, therefore, concur in the conclusion of my associates.